**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Scott MCHALE, Appellant.**

Superior Court of Pennsylvania.

Submitted May 17, 2004.
Filed Sept. 8, 2004.

---

Fortunato N. Perri, Philadelphia, for appellant.

Hugh J. Burns, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before: BENDER, BOWES and JOHNSON, JJ.:

OPINION BY BENDER, J.:

¶ 1 Scott McHale (Appellant) appeals from the March 6, 2003 judgment of sentence of four to eight years' imprisonment imposed upon him following his conviction in a bench trial on charges of aggravated assault, causing an automobile accident while not properly licensed, insurance

fraud, and forged documents. Appellant raises the following issue before the court:

> The evidence was insufficient to support Appellant's convictions for aggravated assault insofar as the evidence failed to establish that the Appellant acted with the requisite *mens rea* necessary to sustain that crime.

Appellant's Brief at 14. We reverse, in part, and affirm, in part.

¶ 2 A brief factual and procedural history follows. On the evening of July 13, 2001, Appellant attended a going-away party with six of his fellow co-workers at the 94th Aerosquadron Bar in Philadelphia. According to testimony of Appellant's co-workers, Appellant consumed a significant amount of alcohol throughout the course of the evening.[1] In addition, testimony was offered as to Appellant's state of apparent intoxication, including his slurred speech and vacillating gait. Upon exiting the bar around 1:00 a.m., Appellant and another man walked to Appellant's 1970 Buick GSX. Despite having neither a valid driver's license nor insurance coverage, Appellant climbed into his car and drove home, however, not without incident.

¶ 3 Appellant's departure from his parking spot was witnessed by Officer Joseph Kayser, an off-duty police officer working as security guard at a construction site located nearby. At trial, Kayser testified that Appellant revved the engine and then sped through the driveway adjacent to the bar prior to turning onto the road. As the car started down the road, Officer Keyser saw Appellant's car come into contact with a car parked on the side of the road and then collide with two people who had been standing near the car, Tammy Seifert and Daniel Caputo. Despite colliding with a parked automobile and hitting two pedestrians, Appellant continued to drive away from the scene over Officer Keyser's shouts to stop. Appellant became the focus of the investigation of this crime a few days later when, after the press released information pertaining to the car involved in the collision, Officer Richard Lewis, of the Accident Investigation Division, received a tip which resulted in his investigation of Appellant's automobile.

¶ 4 Tammy Seifert and Daniel Caputo had walked to Seifert's Kia Sephia when Appellant's car broadsided the Kia, pushing the parked car eight inches due to the force of the collision.[2] According to the expert testimony of Officer Lewis, Seifert became wedged between the two vehicles as they narrowly passed one another, causing her to spin and land 46 feet from the parked car. Caputo was struck by Appellant's car and momentarily impacted the windshield with his head. The momentum of Appellant's car then propelled Caputo an estimated 79 feet from the point of impact. There was no physical evidence that Appellant attempted to brake prior to impact and Officer Lewis opined that Appellant was traveling between 35 and 50 miles per hour at the time of impact. The road was marked with a speed limit of 35 miles per hour.

¶ 5 As a result of the accident, Seifert and Caputo suffered significant physical injuries. Seifert suffered fractures to her femur, tibia, fibula, clavicle, shoulder and

---

1. Christopher Woods testified that Appellant consumed approximately 15 ten ounce glasses of beer. In addition, Ann Marie Winkins observed Appellant consume a shot of vodka.

2. Although Seifert and Caputo do not recall the impact of the car nor the events following the accident, eyewitness testimony from Officer Keyser, injuries sustained by both parties, damage to both vehicles, expert testimony in the area of accident reconstruction from Officer Richard Lewis, and Appellant's own admission all confirm these events as generally stated.

head. At the time of the trial, Seifert continued to have residual pain from her injuries and could not recall the accident at the time of her testimony. Caputo sustained extensive injuries to his head and underwent numerous related surgeries. Caputo has no memory of the crash and continues to experience memory lapses and difficulty concentrating.

¶ 6 After Officer Lewis received the tip implicating Appellant, Officer Lewis went to Appellant's residence where he discovered a white Buick GXS parked outside Appellant's home. Officer Lewis obtained a search warrant for the vehicle and a subsequent examination of the car revealed a substantial amount of evidence linking the car to the accident including damage to the headlights, windshield and hood of Appellant's car, paint from Seifert's Kia, dye from Seifert's pants, and flesh and hair samples from Caputo. A forged insurance card was also found in the glove compartment of Appellant's car.

¶ 7 Appellant met with Officer Lewis on July 18, 2001. Appellant was given his *Miranda* rights and after a valid waiver of these rights, he proceeded to admit that he was driving the GSX at the time of the accident. He further stated his knowledge that his license had been suspended and then declined to provide any additional information as advised by his counsel.

¶ 8 After waiving his right to a jury trial, a bench trial was held on January 6 and 8, 2003. Appellant was acquitted of two counts of aggravated assault by vehicle while intoxicated as well as driving while under the influence of alcohol. Appellant was convicted of two counts of aggravated assault, two counts of causing an accident with no license, insurance fraud, duty to stop in the event of an accident, and altering or forging credentials and documents. N.T., 1/8/3, 59–62. On February 10, 2003, Appellant was sentenced to serve an aggregate of four to eight years' incarceration. The present appeal followed.

¶ 9 On appeal, Appellant challenges the sufficiency of the evidence to support his convictions for aggravated assault. In reviewing the sufficiency of the evidence, we must consider the facts in the light most favorable to the Commonwealth as verdict winner. In order to sustain a conviction, the Commonwealth must introduce evidence from which the factfinder could find every element of the crime beyond a reasonable doubt. *Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958, 963 (2001), *cert. denied*, 535 U.S. 1101, 122 S.Ct. 2303, 152 L.Ed.2d 1059 (2002).

¶ 10 Appellant bases his attack on a lack of the requisite *mens rea* at the time of the accident. In order to establish the crime of aggravated assault, the Commonwealth must prove beyond a reasonable doubt that the accused attempted "to cause serious bodily injury to another or caused such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1).

¶ 11 The Commonwealth concedes that Appellant did not cause the injuries to Seifert and Caputo intentionally or knowingly, but contends that the Appellant's actions satisfied the statutory standard for imposing liability based upon reckless behavior. However, under applicable law, this recklessness must far surpass the definition of recklessness as applied in civil contexts or as conceived in the common vernacular.

¶ 12 As stated in the statutory definition, recklessness manifesting "extreme indifference to the value of human life" must be proven to establish aggravated assault. The corresponding *mens rea* for this standard is "malice", defined in *Commonwealth v. Pigg*, 391 Pa.Super. 418,

571 A.2d 438, 441 (1990), *appeal denied,* 525 Pa. 644, 581 A.2d 571 (1990) (quoting *Commonwealth v. Drum,* 58 Pa. 9, 15 (1868)), as "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." As such, malice is a necessary element of not just aggravated assault, but also of third degree murder. Indeed, malice is the element that raises criminal homicide to culpable murder. Perhaps not coincidentally then, aggravated assault has been described as "the functional equivalent of murder in which, for some reason, death fails to occur." *Commonwealth v. O'Hanlon,* 539 Pa. 478, 653 A.2d 616, 618 (1995).

¶ 13 Since malice is an element common to both third-degree murder and aggravated assault, cases discussing third-degree murder can shed great light on the legal concept of malice. As initially conceived in the third-degree murder context, this heightened *mens rea* of malice is one that falls just shy of a purposeful or knowing killing. The drafters of the Model Penal Code acknowledged this particular point when stating: "this provision [criminal homicide under circumstances manifesting extreme indifference to the value of human life] reflects the judgment that there is a kind of reckless homicide that cannot fairly be distinguished in grading terms from homicides committed purposely or knowingly." [3] Model Penal Code § 210.2. Our Supreme Court has essentially adopted this viewpoint by stating that the *mens rea* requirement in the present offense is "equivalent to that which seeks to cause injury." *O'Hanlon,* 653 A.2d at 618.

■ ¶ 14 Speaking rhetorically, when does reckless conduct rise to such a level to be nearly tantamount to purposeful or intentional conduct? The answer is when "the offensive act [is] performed under circumstances which almost assure that injury or death will ensue." *Id.* at 618 (emphasis added).[4] When one considers that

---

**3.** This contrasts with other classifications of criminal homicide that are based upon lesser degrees of recklessness or criminal negligence, including voluntary and involuntary manslaughter.

**4.** This statement from *O'Hanlon* is hardly a new statement of law. In 1946, our Supreme Court clarified the idea of malice derived from grossly reckless conduct:

> When an individual commits an act of gross recklessness for which he must reasonably anticipate that death to another is likely to result, he exhibits that "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty" which proved that there was at that time in him "the state or frame of mind termed malice."

*Commonwealth v. Malone,* 354 Pa. 180, 47 A.2d 445, 447 (1946) (emphasis added).

*Malone* uses the terminology "gross recklessness" to distinguish the recklessness necessary for malice from "ordinary" recklessness. This differentiation should not be overlooked. Black's Law Dictionary defines "reckless" as "characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; ... Reckless conduct is much more than mere negligence: it is a gross deviation from what a reasonable person would do." Black's Law Dictionary 1276 (7th ed.1999). The usage of the term "gross" as an adjective to recklessness connotes an extreme form of recklessness.

Such a view is bolstered by the words of former Chief Justice Nix, who described the recklessness required for malice thusly:

> [B]etween the recklessness or culpable negligence necessary to support the charge of involuntary manslaughter, *see Commonwealth v. Busler,* 445 Pa. 359, 284 A.2d 783 (1971), and the specific intent to kill which is a prerequisite of murder of the first degree, there is a class of wanton and reckless conduct which manifests such an extreme indifference to the value of human life which transcends the negligent killing and reaches to the level of malice ....

maliciousness represents a state of mind that cannot be fairly distinguished from a purposeful or knowing state of mind, one can understand that reckless conduct will not support a finding of malice unless the conduct in question poses a very high likelihood that death or injury will result. For when such a considerable risk of injury or death has been created and then callously disregarded, the actor demonstrates that he essentially cares not whether he maims or kills another, and when a person consciously creates such a high likelihood that injury or death will ensue, or continues his actions after realizing he has created such a risk, he exhibits the "wickedness of disposition, hardness of heart and cruelty" that is the hallmark of malice. In point of fact, the actor may not actually intend that anyone be injured or killed, but by continuing to act in that fashion the actor demonstrates that he simply does not care whether harm befalls another. Consequently, when injury or death does in fact ensue from the actor's conduct, the law justly attaches criminal culpability that falls just short of intentionality, *i.e.*, maliciousness.

¶ 15 Given the above appreciation of malice, it is not surprising that, as observed in *Commonwealth v. Kling*, 731 A.2d 145, 148 (Pa.Super.1999), "motor vehicle crashes seldom give rise to proof of the malice needed to sustain a conviction for third degree murder or aggravated assault." This is so because, as anyone who has driven for just a few years can attest, even driving behavior that might be deemed unsafe or reckless most often will not produce injury or death. As such, the person who drives in such a fashion, while departing from prudent behavior and clearly negligent, or even "reckless," can-

not be said to acting in such a manner as to essentially intend to injure another. Additionally, when one driving a vehicle creates a circumstance which virtually assures that injury or death will result, the driver often will be driving in such a fashion as to create a substantial risk that he will also be injured or killed. Consequently, unless the driver has essentially a "death wish," or steamrolls through a crowd of pedestrians,[5] it would seem unlikely that the recklessness would rise to the level sufficient to find malice.

¶ 16 Recent appellate decisions involving aggravated assault convictions in similar contexts support the above assessment of the law. Most notably, in *O'Hanlon*, a man who was driving while intoxicated ran a red light and struck another vehicle. With respect to the assessment of the necessary *mens rea*, the Court stated:

> appellant herein drove while intoxicated. Serendipity, not intention, placed the victim in his path when he drove through the red light. The record is not clear as whether he even saw the victim's car coming. The mens rea in such circumstances does not rise to the level of aggravated assault, which is as the Dissent also notes, only one step short of murder. Aggravated assault is, indeed, the functional equivalent of a murder in which, for some reason, death fails to occur. Appellant's behavior, while worthy of criminal penalty, is not so egregious as to find in homicide its analogue, and we find that this comparison was not intended by the legislative definition of aggravated assault.

*O'Hanlon*, 653 A.2d at 618.

¶ 17 Similarly, in *Commonwealth v. Comer*, 552 Pa. 527, 716 A.2d 593 (1998),

---

*Commonwealth v. Taylor*, 461 Pa. 557, 337 A.2d 545, 548 (1975).

**5.** This is a classic example cited for the finding of malice. *See, Comer, infra*, 716 A.2d at 596.

Comer consumed both alcohol and barbiturates and then proceeded to drive at high speeds in an erratic fashion. Comer lost control of his vehicle when his tire rubbed against a curb and sent him crashing into a bus stand. He finally stopped when he struck a brick wall and the vehicle became disabled. As a result of the collision, one person was killed and another seriously injured. Despite the irresponsible and very dangerous conduct of Comer, our Supreme Court overturned his conviction for aggravated assault, finding that he did not possess the state of mind equivalent to that which seeks to cause injury. *Id.* at 596. Additionally, referring to the case of *Commonwealth v. Scofield,* 360 Pa.Super. 552, 521 A.2d 40 (1987), which the Court distinguished, the Court specifically noted that the fact that both Scofield and Comer had drunk alcohol and ingested a controlled substance was not controlling in the determination whether malice was present.

¶ 18 Particularly analogous to the facts at hand, *Commonwealth v. Dellavecchia,* 725 A.2d 186 (Pa.Super.1998) (*en banc*), reached a similar conclusion as well. Intoxicated and speeding, Dellavecchia collided with a parked car containing a young woman and child. Although Dellavecchia applied his brakes prior to impact, both passengers of the parked car suffered serious injury. Following the accident, Dellavecchia attempted to leave the scene but was unable to do so. This Court, sitting *en banc,* overturned his convictions of aggravated assault, concluding that the evidence was insufficient to prove malice. In reaching its decision, this Court felt constrained by the Supreme Court holding in *Comer.*

¶ 19 In contrast to the above decisions stands the cases of *Commonwealth v. Allen,* 833 A.2d 800 (Pa.Super.2003), and *Kling, supra,* motor vehicle collision cases in which malice was found to support

charges of aggravated assault and third-degree murder. In *Allen:*

Appellant left the bar where he had spent the evening drinking and began driving his car on Lewisberry Road in York County. At one point, Appellant drove off the roadway and struck Robbie Maples, a 15–year–old pedestrian. Upon impact, Robbie's leg was severed and his body was impaled on Appellant's windshield. Appellant continued to drive his automobile for approximately 2½ miles until the victim's body rolled off of the windshield near the intersection of Old York Road. However, Appellant did not stop to render aid at that time.

*Id.* at 801. Unquestionably, the facts of *Allen* make a much stronger showing of malice than the other cases cited above. A person who continues to drive with a fifteen year-old boy impaled and suspended on his windshield demonstrates the extreme indifference to human life that evidences the "wickedness of disposition, hardness of heart and cruelty" that is the hallmark of malice. As alluded to earlier, Allen may not have actually intended to injure the victim, however, his actions bespeak a state of mind of a person who cares not whether he maims or kills another.

¶ 20 In *Kling, supra,* the appellant engaged another car in a race on dangerous mountain conditions:

At speeds in excess of 80 m.p.h., both vehicles reached the crest of Scrub Ridge, and with appellant in the lead, the improvident competitors began descending the mountain road.

The first downside mile from the top of Scrub Ridge is riddled with eight substantial curves and five cautionary speed signs. Nevertheless, appellant maintained his excessive speeds, pulling away from the Camaro and disappearing into the blind curves. Through the second of

these curves, appellant was on the wrong side of the road and nearly hit Jean Pepple traveling the opposite direction in her minivan. In spite of this near collision, appellant neither slowed down nor took action to mitigate the obvious danger from his racing.

Approaching the eighth major curve on the downslope, appellant swung into the no-passing zone and blew past two pick-up trucks traveling in front of him. He then headed into the sharp double curve at nearly 70 m.p.h., crossed the center line again, and struck a vehicle driven by Helen Mellott.

*Kling,* 731 A.2d at 146–47. In finding malice, we considered the fact that the appellant was familiar with the road and its dangerous nature having driven on it two to three times a week for more than a year. Driving at breakneck speeds down dangerous roads under these circumstances, the appellant was "plainly warned" that his conduct "was nearly certain to result in a serious or fatal disaster." *Id.* at 150. Nevertheless, the appellant disregarded the nearly certain risk of serious injury or death and continued racing for another 8/10ths of a mile.

■ ¶ 21 Thus, as the case law exemplifies, a line must be drawn between those cases which manifest a clear showing of malice and those that do not. This distinction was made in *O'Hanlon, Comer* and *Dellavecchia* and is not eroded by the decisions in *Allen* and *Kling* where there were truly exceptional circumstances which exhibited the wickedness of disposition, hardness of heart and cruelty encompassed in malice. Given the existing case law and evidence particular to the present case, we conclude that the facts of the present case fall along similar lines as *O'Hanlon, Comer* and *Dellavecchia.* Appellant's actions do not rise to the requisite level of *mens rea* to show malice. Appellant was clearly negligent, but his actions did not rise to the level of recklessness required to support a conviction for aggravated assault. As in *O'Hanlon,* Appellant's actions are certainly "worthy of criminal penalty," however, they cannot be said to be "the functional equivalent of murder in which, for some reason, death fails to occur." *O'Hanlon,* 653 A.2d at 618.

¶ 22 In arguing to the contrary, the Commonwealth cites Appellant's driving despite the suspension of his license and his possession of a forged insurance card. While this is certainly not responsible conduct, to infer that Appellant virtually intended to cause harm to others based upon his lack of a valid license defies common sense and is an impermissible intuitive leap. The evidence certainly establishes no more than that Appellant wished to continue driving despite the fact that his license had been suspended and took admittedly illegal measures to facilitate this desire.

■ ¶ 23 Secondly, the Commonwealth points to Appellant's alcohol consumption in support of his recklessness. This argument is similarly unavailing. There is no indication that by drinking alcoholic beverages, Appellant wished to harm others. While driving after consuming so much alcohol was an irresponsible act, the Commonwealth essentially seeks the creation of a "strict liability" for those who drink and drive, a recklessness *per se.* As observed in *Commonwealth v. Mastromatteo,* 719 A.2d 1081, 1083 (Pa.Super.1998), and reiterated in *Comer,* driving under the influence does not create recklessness *per se.*

¶ 24 In addition to intoxication, the Commonwealth points to the manner in which Appellant drove, as reported by Officer Keyser, an off-duty police officer working nearby as a security guard. Officer Keyser testified that he heard Appellant rev

the engine and "burn rubber" as he exited the driveway. N.T., 1/7/03, at 26. While unnecessary and irresponsible, this showboating neither exhibits a desire to harm nor demonstrates driving so dangerously as to "almost ensure that injury or death will ensue." Nevertheless, assuming *arguendo*, that Appellant was showing off and speeding, this does not show that he was acting in a manner so regardless of concern for the safety of others that he would almost certainly cause serious physical injury or death. As common experience teaches, many people routinely drive over the speed limit without consequence.

¶ 25 The Commonwealth further asserts that by "dragging" Caputo on the hood of his car during the collision, Appellant exhibited malice. We disagree. As testified by Officer Lewis, Caputo was likely carried for "[a]pproximately 20 hundredths of a second". N.T., 1/6/03, at 136. Lewis further testified that the entire collision took approximately 1.3 seconds from impact to completion. N.T., 1/6/03, at 133. Given the brevity of the incident, it is quite likely that Appellant did not have time to react to avoid the collision nor realized exactly what had occurred. No malice can be inferred from the fact that the force of impact propelled Mr. Caputo onto the hood of the car momentarily.

¶ 26 Finally, the Commonwealth asserts that Appellant demonstrated malice by failing to stop and render aid after the accident. We disagree. In the first instance, this Court found no malice where an intoxicated driver attempted to drive away following a collision in the aforementioned *Dellavecchia*. Thus, a failure to stop and render aid cannot be automatical-ly equated with malice. In the second instance, the inquiry of relevance is Appellant's state of mind prior to or at the time of the accident, not after. In this respect, actions taken after the accident might possibly reflect upon Appellant's state of mind prior to the accident. However, it appears just as likely that such actions reflect only a reaction to an unintended accident. While Appellant's desertion after the collision was certainly self-serving and callous, it does not necessarily indicate that Appellant possessed a state of mind that nearly equates with the desire to harm prior to or at the time of the accident. It is equally plausible that Appellant panicked after realizing what he had done and desired to avoid detection or apprehension by the police. While such acts exposed Appellant to criminal penalty for leaving the scene of an accident, this separate offense does not establish malicious intent prior to or at the time of the accident.

¶ 27 In light of the reality that most motor vehicle accident cases, even those caused by a drunk driver, will not evidence the *mens rea* of malice, the legislature has enacted lesser offenses that can be charged, which were specifically designed to address a situation where malice is lacking but where heightened criminal punishment is deemed appropriate, such as aggravated assault by vehicle while driving under the influence ("DUI"), and homicide by vehicle-DUI related. In particular, the aggravated assault by vehicle while driving under the influence offense requires only *negligence* and not recklessness.[6] This lowered requisite intent is reflected in the classification of the offense as well; aggravated assault is a felony of the first degree

---

6. The relevant statute currently reads as follows: "Any person who negligently causes serious bodily injury to another person as a result of a violation of section 3802 (relating to driving under influence of alcohol or con-trolled substance) and who is convicted of violating section 3802 commits a felony of the second degree when the violation is the cause of the injury." 75 Pa.C.S. § 3735.1.

whereas aggravated assault while DUI is a second degree felony.

¶ 28 Despite the fact that caselaw clearly establishes that extreme indifference malice requires circumstances that bring the conduct ever so close to purposeful or intentional conduct, and despite the fact that the legislature has created specific offenses to address the causing of injury through drunken driving, some prosecutors have sought to increase the penalties in certain drunk driving cases that resulted in injury or death by charging offenders with more serious offenses, *i.e.,* aggravated assault instead of reckless endangerment and third-degree murder instead of homicide by vehicle, homicide by vehicle-DUI related or involuntary manslaughter. Undoubtedly these attempts were motivated by an appreciation for the sheer tragedy and senselessness of the carnage resulting from the accident in question. Nevertheless, while meeting mixed success earlier,[7] starting with *O'Hanlon,* these attempts have largely failed as appellate courts have refocused on the distinctions in *mens rea* while putting aside the tragic, yet still undesired, consequences of the actor's decision to drive while drunk.

¶ 29 Although Appellant clearly should be found culpable for his irresponsible actions, the evidence at hand does not support a finding of malice necessary to prove aggravated assault. There is no doubt that drunk driving is reprehensible. Statutes have been enacted to punish this offense and offenders should be prosecuted accordingly. However, here, the Commonwealth seeks to blur the lines of criminal liability based upon negligence, ordinary recklessness and the form of recklessness encompassed in malice, that reflects "extreme indifference to the value of human life," in order to create a sort of malice *per se* from the act of driving while under the influence. If focusing merely on the tragic consequences of theses actions, there is a tremendous temptation to allow the "book" to be thrown at such offenders. However, we cannot let our contempt for this irresponsible behavior and compassion for the victims involved supplant the legal standards upheld as part of a centuries-old common law tradition and enacted by our legislature. Based upon the lack of evidence to support a requisite finding of malice, we reverse Appellant's convictions for aggravated assault. As this disposition will affect Appellant's overall sentencing scheme, we vacate the judgment on Appellant's remaining convictions and remand for resentencing accordingly.

¶ 30 Judgment of sentence for aggravated assault reversed and Appellant discharged thereon. For all other charges, Appellant's convictions are affirmed. Judgment of sentence for the remaining convictions vacated. Remanded for sentencing. Jurisdiction relinquished.

---

7. *See Commonwealth v. Scofield,* 360 Pa.Super. 552, 521 A.2d 40 (1987), *alloc. denied,* 517 Pa. 593, 535 A.2d 82 (1987), *Commonwealth v. Urbanski,* 426 Pa.Super. 505, 627 A.2d 789 (1993), *appeal denied,* 535 Pa. 657, 634 A.2d 221 (1993), *Commonwealth v. Scales,* 437 Pa.Super. 14, 648 A.2d 1205 (1994), and *Commonwealth v. Pigg,* 391 Pa.Super. 418, 571 A.2d 438 (1990). While each case must be assessed on its individualized facts, few of the cases pre-dating *O'Hanlon* have acknowledged that the *mens rea* requirement for either aggravated assault or third-degree murder is essentially "equivalent to that which seeks to cause injury." *O'Hanlon,* 653 A.2d at 618.