J-S14013-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :   IN THE SUPERIOR COURT OF
:             PENNSYLVANIA
Appellee                 :
:
v.                   :
:
KENISHA TYLER,                   :
:
Appellant            :   No. 532 EDA 2014

Appeal from the Judgment of Sentence January 16, 2014,
Court of Common Pleas, Philadelphia County,
Criminal Division at No. CP-51-CR-0008610-2012

BEFORE:  DONOHUE, OLSON and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED APRIL 14, 2015**

Appellant, Kenisha Tyler ("Tyler"), appeals from the judgment of

sentence entered on January 16, 2014 following her convictions for simple

assault, 18 Pa.C.S.A. § 2701, aggravated assault, 18 Pa.C.S.A. § 2702, and

conspiracy, 18 Pa.C.S.A. § 903.  For the reasons that follow, we affirm the

convictions.

The trial court aptly summarized the evidence introduced at trial as

follows:

> The complainant, Ms. Joh'nae Nicole Thompson
> [("Thompson")], testified to two separate events
> occurring on March 18, 2012 and March 19, 2012.
> (N.T., 8/1 9/12 pgs. 26 — 83).  On March 18, 2012
> at approximately 3:00 p.m., while walking to work,
> [Thompson] encountered [Tyler]. (N.T., 8/19/12 pg.
> 27).  [Tyler] began yelling at [Thompson] "Do you
> want to fight?"  (N.T., 8/1 9/12 pg. 28).
> [Thompson] answered [Tyler] that she did not want
> to fight her [and] that she was on her way to work[;]

[Thompson] then continued walking to work. [Tyler] followed and yelled out to [Thompson] again asking her if she wanted to fight and [Thompson] responded in the same way, and continued walking. (N.T., 8/19/12 pg. 28). [Tyler] then told [Thompson] "No, you want to fight me, so we're going to fight[,]" then threw a punch that hit [Thompson] on the left side of her face. (N.T., 8/19/12 pgs. 28, 29). [Thompson] felt she had no choice but to defend herself and began to fight back with [Tyler]. (N.T., 8/19/12 pg. 29, 53).

[Thompson] testified that while she was engaged with [Tyler], more women, that she did not recognize, began punching, kicking, and jumping on her. (N.T., 8/19/12 pgs. 29-30, 59, 60). She recalled being beaten by the entire group, including [Tyler], for about three minutes until she was eventually pulled out from under the assailants by a neighbor. (N.T., 8/19/12 pg. 31). [Thompson] was shaken up by the incident but was able to walk home[;] her mother and father were home when she arrived, and they helped her to calm down. [Thompson] testified that she received a chipped tooth, a black eye, a few bumps on her face and several scrapes on her body from this incident. (N.T., 8/19/12 pg. 31). Her mother took pictures of her injuries shortly after she arrived home. (N.T., 8/19/12 pg. 44).

On March 19, 2012 [Thompson] went to the police station to report the assault from the previous evening. She was directed to the Southwest Detectives in the 18th district located on 55th Street and Pine Street, and spoke with Detective Campbell about the incident with [Tyler] that occurred March 18, 2012. (N.T., 8/19/12 pg. 33). [Thompson] testified that she was speaking with the detective until about 2:30 p.m., after speaking with the detective she went directly home.

When she arrived home from the police station[,] she was sitting outside with her mother, father,

aunts, cousins and some neighbors explaining what happened the night before and at the police station. [Thompson] stated that while she was outside she saw [Tyler]'s sisters, Kiera and Amarra, approaching from the corner. (N.T., 8/19/12 pg. 34). When Kiera saw her she taunted [Thompson] yelling "My sister mangled your face." [Thompson] responded "You are a stupid bitch and so is your sister." Kiera then threw a punch at her. (N.T., 8/19/12 pg. 35, 64).

[Thompson] defended herself and began fighting Kiera. While [Thompson] was already engaged with Kiera, Amarra began punching her as well. This altercation went on for about two minutes until neighbors broke the three of them apart. (N.T., 8/19/12 pgs. 35-36).

Kiera and Amarra then left only to return five minutes later with [Tyler] and approximately thirty other people on foot and in vehicles. (N.T., 8/1 9/12 pgs. 36, 67, 68). The crowd with [Tyler] and her sisters rushed over and attacked [Thompson]'s family. Kiera attacked [Thompson], and while they were engaged [Tyler] came from behind [Thompson] and punched her in the face. [Tyler]'s punch knocked [Thompson] down on top of [Tyler]'s sister, Kiera. (N.T., 8/19/12 pgs. 37, 68 69). While [Thompson] was on the ground [Tyler] grabbed her hair and slammed her head into a cobblestone wall twice. The melee stopped shortly thereafter. (N.T., 8/19/12 pgs. 38, 70).

[Thompson] was rushed to the University of Pennsylvania Hospital by ambulance. (N.T„ 8/19/12 pg. 39). She was treated and admitted through emergency for multiple abrasions throughout her upper extremities, with a contusion to her orbital and orbital swelling resulting from a left orbital flora fracture[;] she stayed at the hospital for three days. (N.T., 8/19/12 pg. 41, 8/20/12 pg. 47). She returned to the hospital March 26, 2012 for surgery to correct the broken bone, and was admitted to the

hospital, for recovery, for four days. (N.T., 8/19/12 pg. 41).

As a result of the injuries sustained during the incident, [Thompson] had quadruple vision for about four months, and was placed on medical deferment from enlisting in the military. (N.T., 8/19/12 pgs. 42-43). She was cleared for active military duty on July 26th, 2013. N.T., 8/19/12 pg. 42).[1]

\* \* \*

Philadelphia Police Officer Pamela Roberts testified that on March 19, 2012 she was working the activity desk inside the nineteenth district. (N.T., 8/20/13 pg. 41, 42). On that day, [Thompson] came in to make a police report. (N.T., 8/20/13 pg. 42). [Thompson] told Officer Roberts that she had been assaulted by the [Tyler]. (N.T., 8/20/13 pg. 44, 45). [Thompson] told Officer Roberts that she was walking to the store when [Tyler] approached her, alongside five to six black females, and asked if she wanted to fight. (N.T., 8/20/13 pg. 45). When [Thompson] came to make the police report, Officer Roberts noticed that she had a black right eye and her front bottom tooth was chipped. (N.T., 8/20/13 pg. 45). Officer Roberts documented all of this on a 75-48 incident report and later sent the report to Southwest Detectives. (N.T., 8/20/13 pg. 45).

Trial Court Opinion, 8/1/2014, at 4-8.

On August 21, 2013, a jury convicted Tyler of the three above-referenced crimes. The trial court sentenced her to 11 and one half to 23 months of confinement in the county prison on the simple assault conviction, five years of probation on the aggravated assault conviction, and five years

---

[1] The trial court also summarized the testimony of Thompson's mother, Christina Miller-Marcus, whose recollection of events was consistent with and supportive of Thompson's testimony.

of probation (concurrent) on the conspiracy conviction. This appeal followed, in which Tyler presents the following seven issues for our consideration and determination:

1. Did the trial court err during jury selection by engaging in excessive rehabilitation of several potential jurors who stated that they would be more likely to believe police witnesses?

2. Did the trial court err in allowing inflammatory color photographs of [Thompson's] facial injuries to be published to the jury?

3. Did the trial court err and cause irreparable harm and prejudice to [Tyler] when, while [Tyler] was testifying before the jury, the trial court told [Tyler] that she had committed a crime?

4. Did the trial court err in refusing to give a charge for Simple Assault with regard to the incident that occurred on March 19, 2012, because there was no risk of death to [Thompson] and [Thompson] did not suffer serious permanent disfigurement or protracted loss of the function of any bodily member or organ?

5. Did the trial court err in refusing to include malice and a definition thereof in its charge for Aggravated Assault as a Felony of the First Degree?

6. Did the trial court err in interrupting [Tyler's] counsel and engaging in a lengthy soliloquy during closing argument, causing harm and prejudice to [Tyler], when counsel simply and correctly read the Aggravated Assault statute for which [Tyler] had been charged?

7. Was there sufficient evidence as a matter of law that [Tyler] was guilty of Aggravated Assault as a Felony of the First Degree and Conspiracy to commit the same as to events that occurred on March 19, 2012?

Tyler's Brief at 4-5.

For her first issue on appeal, Tyler claims that she was not tried before an impartial jury because during voir dire the trial court "excessively rehabilitat[ed] potential jurors who stated that they would be more likely to believe police testimony rather than testimony from civilian witnesses." Tyler'' Brief at 10. Conversely, Tyler contends that a "pro-defense juror" was not similarly rehabilitated and then excused. *Id.* According to Tyler, the trial court's conduct required her to use preemptory challenges against jurors that should have been dismissed for cause.

The scope of voir dire is at the discretion of the trial court. *Commonwealth v. Ellison*, 902 A.2d 419, 424 (Pa. 2006). "The opportunity to observe the demeanor of the prospective juror and the tenor of the juror's answers is indispensable to the judge in determining whether a fair trial can be had in the community. Claims of impartiality by prospective jurors are subject to scrutiny for credibility and reliability as is any testimony, and the judgment of the trial court is necessarily accorded great weight." *Commonwealth v. Bachert*, 453 A.2d 931, 937 (Pa. 1982). This Court should not reverse decisions of the trial judge concerning voir dire in the absence of palpable error. *Ellison*, 902 A.2d at 424. The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence. *Cordes v. Associates of Internal*

- 6 -

***Med.***, 87 A.3d 829, 864 (Pa. Super.) (en banc), *appeal denied*, 102 A.3d 986 (Pa. 2014).

Tyler directs our attention to the testimony of three jurors, each of whom answered in the affirmative to a question on a jury questionnaire regarding whether they would be more likely to believe the testimony of police officers because of their job. The relevant testimony of these three witnesses, against whom Tyler exercised preemptory challenges, is as follows, beginning with juror Maurice O'Donnell:

| [COURT]: | You also said that you would be more likely to believe the testimony of a police officer or anybody in law enforcement because of their job; is that right? |
|---|---|
| [PANELIST]: | Yes, sir. |
| [COURT]: | Here's the real question: If a police officer comes in here and testifies, are you able to evaluate his or her testimony and make a determination – is he telling the truth or not; is he exaggerating or not; is this reliable or not – or are you telling me with this answer that if a police officer testifies, it must be true, he's a police officer? |
| [PANELIST]: | I think you have to take in the sense of this is a member of the law enforcement community and that he is a responsible – he or she is a responsible individual; otherwise, they shouldn't be in their current position. |
| | I know good police officers and bad police officers. |
| [COURT]: | So if I understand what you're saying, in some cases, you might believe the police officers; in some cases, you might not? |

| [PANELIST]: | Yes, sir. |
| --- | --- |
| [COURT]: | So based on your conversation and your questionnaire, it's my understanding that there's no reason why you would not be a fair juror. |
| | There's no reason why you can't sit on this jury, correct? |
| [PANELIST]: | Correct. |

N.T., 8/19/2013,[2] at 40-41.

The relevant testimony of juror Iwona Herok:

| [COURT]: | So you expect police officers to tell the truth? |
| --- | --- |
| [PANELIST]: | Yes. |
| [COURT]: | But the question is, if you're sitting on this jury, are you able to evaluate all of the witnesses, including any police officers – I don't know if there will be police witnesses; but if there are police witnesses, would you be able to evaluate their testimony and make a determination whether they're telling the truth or not or since they're a police officer, you're just going to accept whatever they say – it must be the truth. |
| [PANELIST]: | I would expect them to tell the truth since – I don't know. I think all police officers, it is their job. It's part of their job to be honest with everybody. So I would expect them to be honest when they're on the jury stand. Like if it was me on there, everybody would expect me to tell the truth, not to lie under the oath and pay the consequences. |
| [COURT]: | Okay. So you're telling me you expect every witness to tell the truth? |

---

[2] The transcript of the jury selection process was incorrectly dated August 19, 2014.

[PANELIST]: Yes. If they're honest, yes.

[COURT]: All right. So when you say you expect police officers to tell the truth, it's not because of their job; it's because they're witnesses?

[PANELIST]: Because they're under oath like myself; if you're under oath, you should be telling the truth, not doing something that you would have to pay consequences for.

[COURT]: Okay. Can you accept the possibility that sometimes people testify and they don't tell the truth?

[PANELIST]: That's hard to believe, but it's a possibility.

[COURT]: So are you able to sit on this jury and make that kind of determination – is this witness telling the truth or is this witness telling me something else?

[PANELIST]: True.

[COURT]: So then in some cases, you might believe a police officer; in some cases, you might not?

[PANELIST]: True.

[COURT]: So having gone through all these questions with you and reviewing your questionnaire, it's my impression that there's no reason why you would not be a fair juror.

There's no reason why you can't sit on this jury, correct?

[PANELIST]: Correct.

**Id.** at 74-76.

The relevant testimony of juror Robert Peck:

[COURT]: You also said that you would be more likely to believe the testimony of a police officer or anybody

|  | in law enforcement because of their job; is that right? |
|---|---|
| [PANELIST]: | Yes. |
| [COURT]: | Here's the real question: If a police officer comes in here and testifies, are you able to evaluate his or her testimony and make a determination – is he telling the truth or not; is he exaggerating or not; is this reliable or not – or are you telling me with this answer that if a police officer testifies, it must be true – he's a police officer. |
| [PANELIST]: | I would listen to him carefully and determine whether he was telling the truth or not. |
| [COURT]: | So in some cases, you might believe the police officer; in some cases, you might not? |
| [PANELIST]: | Correct. |
| [COURT]: | Based on our discussion and your questionnaire, it appears that there's no reason why you would not be a fair juror.

There's no reason why you can't serve on this jury, correct? |
| [PANELIST]: | Correct. |

*Id.* at 92-93.

Finally, the testimony of "pro-defense' juror Lucas Brown, who the trial court dismissed for cause:

| [COURT]: | When I was asking questions of the panel, you raised your hand.

Do you remember what that was for? |
|---|---|
| [PANELIST]: | That if I knew anybody was in here. |

[COURT]:        Yes.

[PANELIST]:     I mean, I don't know you personally, but I know who you are.

[COURT]:        How do you know me?

[PANELIST]:     My brother-in-law and my sister are defenders.

[COURT]:        And they complain about me a lot?

[PANELIST]:     I didn't say that.

[COURT]:        So you recognize my name, but we've never met. I've never seen you as far as I know.

[PANELIST]:     I'm not sure.

[COURT]:        Okay.  What you've just described, is there anything about that that would prevent you from being a fair juror if you were sitting on this case?

[PANELIST]:     Beyond like my already personal opinions about this?

                Probably not.

[COURT]:        Well, while we're on the subject, what are your personal opinions that you think might prevent you from being fair?

[PANELIST]:     The system, I don't really think it works.  We have a broken school district.  We put money into the prisons left and right.

*Id.* at 55-56.

Based upon our review of the above testimony in its entirety, we cannot agree with Tyler that the trial court "excessively rehabilitat[ed]" jurors O'Donnell, Herok, and Peck.  Instead, the certified record reflects only that the trial court questioned these jurors regarding their questionnaire

- 11 -

answers and determined that each juror would consider the testimony of any police witnesses objectively.[3]  Conversely, juror Brown suggested that he did not think he could be fair based upon his "personal opinions" about the school system and prisons.  As set forth hereinabove, our standard of review in this regard is extremely deferential to the trial court, which, unlike this Court, had the opportunity to observe the prospective jurors when determining whether they could serve as impartial arbiters of the evidence presented.  **Bachert**, 453 A.2d at 937  According the trial court's decisions with great weight, as we must, we cannot say that that the trial court committed "palpable error" in its decisions during the voir dire process.  No relief is due on Tyler's first issue on appeal.

For her second issue on appeal, Tyler contends that the trial court erred in publishing to the jury "inflammatory color photographs" of Thompson's facial injuries.  Tyler's Brief at 13.  Tyler argues that these photographs were cumulative evidence, prejudicial, and "inflammatory in their color version." **Id.**

The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice,

---

[3]  We note that only one police witness testified at trial.  Officer Pamela Roberts did not witness any of the events (fighting) at issue in this case, and instead her testimony was limited to her observations when she took a police report when Thompson came into the nineteenth district on March 18, 2012 to report Tyler's attack on her earlier that day.  N.T., 8/20/13 pg. 41-42.

constitutes reversible error. **Commonwealth v. Malloy**, 579 425, 856 A.2d 767, 776 (Pa. 2004). Relevant evidence makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Relevant evidence may be excluded only if its probative value "is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403. Whether photographic evidence that is alleged to be inflammatory is admissible involves a two-step analysis. First, the court must decide whether a photograph is inflammatory by its very nature. **Commonwealth v. Sanchez**, 36 A.3d 24, 49 (Pa. 2011), *cert. denied*, 133 S.Ct. 122 (2012). If the court decides that the photograph is inflammatory, it must determine whether its essential evidentiary value outweighs the likelihood that its publication will improperly inflame the minds and passions of the jury." **Id.**

In this case, the trial court decided that the photographs in question were not inflammatory, and were relevant because they depicted Thompson's injuries for the jury. Trial Court Opinion, 8/1/2014, at 12. We are unable to conduct a meaningful review of the trial court's discretion because the allegedly objectionable photographs are not contained in the certified record on appeal. **See Commonwealth v. Cottam**, 616 A.2d 988, 1002 n.7 (Pa. Super. 1992) (stating "it is [appellant's] responsibility to

- 13 -

provide a record replete with all exhibits necessary for this court to review the issues raised"), *appeal denied*, 535 Pa. 673, 636 A.2d 632 (1993). Accordingly, we find this claim to be waived. ***See Commonwealth v. Lassen***, 659 A.2d 999, 1008 (Pa. Super. 1995) (holding appellant's assertion that photographs of the victim's injuries were inadmissible based on their inflammatory and prejudicial nature was waived because he failed to include those photographs in the record).

For her third issue on appeal, Tyler complains that the trial court refused to grant a motion for mistrial or issue a curative instruction after the trial judge "interject[ed] himself into a jury trial and [told Tyler] that she was guilty of a crime." The relevant portion of the transcript during Tyler's direct examination is as follows:

> A.    She was like, You know what, just drop your things - - okay.
>
> So we both put down our things. She gave the boy, Mike, who was with her – at that time, she gave him her bag and whatever else she had in her hand. I put my things down.
>
> She said, This is what you want; this is what you want; you are about to get it – okay.
>
> I threw my hands up as well.
>
> [COURT]:  All right. So you're saying that after you had some words, the two of you agreed –
>
> [TYLER]:  Yes.
>
> [COURT]:  -- that you were going to fight?

[TYLER]: Yes, sir.

[COURT]: Okay.

[TYLER]: She gave him her things. I put my things down. We both threw our hands up.

She said, This is what you want.

And then she swung. And then we wind up fighting.

Q. So the first swing was –

A. Was initially [Thompson].

[COURT]: Well, it doesn't matter who was the first swing.

Before the first swing was swung, the two of you had agreed that you were going to fight, is that what you're saying?

[TYLER]: Yes.

[COURT]: Okay. That's – you understand that that's against the law in Pennsylvania?

You understand that two people cannot by mutual consent agree to a fight?

It's called simple assault, mutual consent, do you understand that?

[TYLER]: Yes.

[COURT]: Okay.

N.T., 8/20/2013, at 53-54.

Rule 605(B) of the Pennsylvania Rules of Criminal Procedure governs the granting of mistrials:

§ 605. Mistrial.

> (B) When an event prejudicial to the defendant
> occurs during trial only the defendant may move for
> a mistrial; the motion shall be made when the event
> is disclosed. Otherwise, the trial judge may declare
> a mistrial only for reasons of manifest necessity.

Pa.R.Crim.P. 605(B). Furthermore, it is within the sound discretion of the trial court to determine whether a curative instruction is necessary, or even desirable. ***Commonwealth v. Sanchez***, 82 A.3d 943, 982 (Pa. 2013), *cert. denied sub nom.,* ***Sanchez v. Pennsylvania***, 135 S. Ct. 154 (2014).

The Commonwealth persuasively submits that this claim is waived. Tyler did not move for a mistrial or request a curative instruction at the time of the above-quoted testimony. Instead, Tyler did not move for relief until much later that day, after the completion of Tyler's testimony and that of her cousin (Felicia Tyler). In contravention of Rule 605(B), then, Tyler did not make a timely request for relief.[4] Pa.R.Crim.P. 605(B); ***Commonwealth v. Strunk***, 953 A.2d 577, 580 (Pa. Super. 2008) ("[O]ne must object to errors, improprieties or irregularities at the earliest possible stage of the criminal or civil adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.") (quoting ***Commonwealth***

---

[4] Tyler does not contend that manifest necessity existed on the facts presented here.

- 16 -

*v. English*, 667 A.2d 1123, 1126 (Pa. Super. 1995), *affirmed*, 699 A.2d 710 (Pa. 1997)).

Moreover, even if not waived, we are not persuaded that that the trial court erred in refusing to grant a mistrial. "A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial." *Commonwealth v. Jones*, 542 464, 668 A.2d 491, 503 (Pa. 1995), *cert. denied*, 519 U.S. 826 (1996); *Commonwealth v. Boczkowski*, 454, 846 A.2d 75, 94-95 (Pa. 2004). The extent to which Tyler was prejudiced by the trial court's questions, if at all, is unclear. Rather than stating an objection or requesting a mistrial, counsel for Tyler responded to the trial court's questions by rehabilitating Tyler -- eliciting considerably more favorable testimony from her, including that it was Thompson who wanted to fight, that she (Tyler) did not want to do so, that she felt threatened and scared by Thompson's threats, and that she attempted to break up the fight when others joined in against Thompson. N.T., 8/20/2013, at 54-58. To the extent that Tyler suffered any prejudice, it did not rise to the high level necessitating the grant of a mistrial.

We are likewise not convinced that the trial court erred in refusing to give a curative instruction. The transcript shows that the trial court offered to consider giving one if drafted by Tyler's counsel, but thereafter could not agree with the strong language recommended by counsel. *Id.* at 97-98. In

addition, while not specifically directed to the above-quoted questions, the trial court gave an extended instruction during its charge to the jury to ignore any of the trial court's comments or opinions when reaching its verdict:

> Likewise, if I have said or done anything during the trial or during this instruction that I'm giving you now which implies my opinion as to any witness, any evidence or what your verdict should be in this case, I want to tell you two things. First, I have no opinion. And second, if I had an opinion, it would be the least well-informed opinion in this courtroom, because, as I explained to you at the beginning of the trial, most of the time, I can hardly see the witness.
>
> I got a pretty good look at the witness who was in the scooter because she wasn't in the chair. She was seated further back. She was an exception.
>
> I can't see facial expression. I can't see gestures. And I get distracted. I'm up here dealing with other things. As I told you at the outset, your job and my job are different. So a lot of times, I'm going through papers, I'm looking through this file or files from other cases, I'm off on the side talking to the courtroom staff. So two things, one, I have no opinion; and second, if I did, you should disregard it, because the only opinion in this courtroom that matters is your opinion – your opinion of the evidence, your opinion of the witnesses and ultimately your opinion as to what the verdict should be in this case.

N.T., 8/21/2013, at 13-14.

For her fourth issue on appeal, Tyler claims that the trial court erred in refusing to give a jury charge on simple assault for her actions on March 19,

- 18 -

2012. Tyler argues that the jury could have found her guilty of simple assault rather than aggravated assault, noting that there was no risk of death to Thompson and Thompson did not in fact suffer a serious bodily injury (serious impairment, disfigurement, or loss of the function of a bodily member or organ). Tyler's Brief at 17. The trial court, upon consideration of the evidence presented at trial, determined that "[n]o evidence of simple assault was presented." Trial Court Opinion, 8/1/2014, at 20.

In **Commonwealth v. Sirianni**, 428 A.2d 829 (Pa. Super. 1981), this Court determined, based upon the following analysis of the two statutes, that simple assault is a lesser included offense to aggravated assault:

> [W]e come to the next step of deciding whether or not simple assault, defined in section 2701(a)(1) as attempting to cause "bodily injury" is, in fact, a lesser included offense of aggravated assault, defined in section 2702(a)(1) as attempting to cause "serious bodily injury." The "serious bodily injury" required to prove aggravated assault is defined as "(b)odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. On the other hand, the "bodily injury" required to prove simple assault is defined as "(i)mpairment of physical condition or substantial pain." A comparison of the above-quoted sections indicates that the definition of "serious bodily injury" contains "bodily injury" within it. In **Commonwealth v. Wilds**, this Court sitting en banc stated that "an offense is a lesser included offense if each and every element of the lesser offense is necessarily an element of the greater." This test has been met here. "Simple assault" as an attempt to cause mere bodily injury is, therefore, a lesser

> included offense of aggravated assault which is an attempt to cause serious bodily injury.

*Id.* at 632-33 (citations omitted).

The proper focus in distinguishing between simple and aggravated assault is thus on the defendant's intent and actions. ***Commonwealth v. Thomas***, 546 A.2d 116, 118 (Pa. Super. 1988). A defendant is entitled to a jury instruction on a lesser included offense only where the evidence in the record would permit the jury to find, rationally, that the defendant is guilty of the lesser included offense but not of the greater offense. ***Id.***

A trial court has wide discretion with respect to its jury instructions, and commits an abuse of discretion only when there is an inaccurate statement of the law. ***Commonwealth v. Jones***, 954 A.2d 1194, 1198 (Pa. Super. 2008); ***Commonwealth v. Einhorn***, 911 A.2d 960, 975 (Pa. Super. 2006). Here the trial court, upon consideration of the evidence introduced at trial, determined that "[n]o evidence of simple assault was presented" and declined to instruct on simple assault for the events of March 19, 2012. Trial Court Opinion, 8/1/2014, at 20.

We conclude that the trial court did not abuse its discretion in refusing to give an instruction on simple assault regarding Tyler's actions on March 19, 2012, for two reasons. First, contrary to Tyler's claims, it was within the jury's province to conclude that Thompson's injuries resulting from the events on March 19 did qualify as serious bodily injuries. The definition of

- 20 -

"serious bodily injury" includes "protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. The evidence showed that Thompson suffered a broken bone in the optical region of her face that caused her to have double vision for four months, and this injury eventually required surgery and a sustained deferment from military service. N.T., 8/19/2013, at 41; N.T., 8/20/2013, at 47. The protracted nature of these injuries to her eyes and vision could constitute serious bodily injury (rather than mere bodily injury), and thus the intentional and/or knowing nature of Tyler's actions in inflicting these injuries would preclude any rational finding that Tyler was guilty of only simple assault (rather than aggravated assault).

Second, even if Thompson did not suffer a serious bodily injury, the trial court did not abuse its discretion in determining, based upon the entirety of the evidence presented at trial, that the jury could not have rationally found that Tyler was guilty of only simple, as opposed to aggravated, assault for her actions on March 19, 2012. This Court has consistently held that multiple blows to a person's head reflects an intention to inflict serious bodily injury. *See, e.g.*, *Commonwealth v. Pandolfo*, 446 A.2d 939, 941 (Pa. Super. 1982); *Commonwealth v. Bruce*, 916 A.2d 657, 661-62 (Pa. Super. 2007); *Commonwealth v. Burton*, 2 A.3d 598, 605 (Pa. Super. 2010) (en banc) (single blow to the head knocking the victim to the ground). In the present circumstances, where the level of

Tyler's violence escalated from March 18 to March 19, and where Tyler twice slammed Thompson's head into a wall with enough force to break a bone in her face and cause her to suffer double vision for four months, it was well within the trial court's discretion to decide that the evidence was consistent with only a charge for aggravated assault.

For her fifth issue on appeal, Tyler contends that the trial court erred in failing to instruct the jury on the definition of malice in connection with its charge on the elements of aggravated assault. This issue is without merit. As defined by statute, aggravated assault involves an attempt "to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1). Parsing this language, either of three *mens rea* will suffice: intentional conduct, knowing conduct, or reckless conduct with malice (i.e., under circumstances manifesting extreme indifference to the value of human life.). As such, this Court has held that malice is required for aggravated assault when the *mens rea* at issue is recklessness. ***Commonwealth v. McHale***, 858 A.2d 1209, 1212 (Pa. Super. 2004) ("Appellant was clearly negligent, but his actions did not rise to the level of recklessness required to support a conviction for aggravated assault."); ***Commonwealth v. Myers***, 722 A.2d 1074, 1077 (Pa. Super. 1998) ("[T]he trial court instruction included the critical language 'recklessly under circumstances manifesting extreme indifference

to the value of human life.' This adequately informed the jury a heightened state of recklessness amounting to malice was required to convict under 18 Pa.C.S. 2702(a)(1)."), *appeal denied*, 722 A.2d 1074 (Pa. 1999); ***Commonwealth v. Nichols***, 692 A.2d 181, 186 (Pa. Super. 1997) ("[w]here malice is based on the recklessness of consequences, it is not sufficient to show mere recklessness as codified at 18 Pa.C.S.A. § 302(b)(3); but rather, it must be shown that the defendant consciously disregarded an **unjustified and extremely high risk** that his actions might cause death or serious bodily harm.") (emphasis in original) (quoting ***Commonwealth v. Fierst***, 4620 A.2d 1196, 1203 (Pa. Super. 1993)).

In this case, the Commonwealth did not request, and the trial court did not give, an instruction based upon recklessness, and instead the instruction to the jury focused solely on intentional or knowing misconduct:

> [T]he next element is that the defendant acted intentionally, knowingly. A person acts intentionally with respect to serious bodily injury when it is her conscious object or purpose to cause such injury. A person acts knowingly with respect to serious bodily injury when she is aware that it is practically certain that her conduct will cause such a result. If you're convinced that the Commonwealth has proven all of those elements beyond a reasonable doubt, then you must find the defendant guilty of aggravated assault.

N.T., 8/21/2013, at 43. Because the trial court limited its instruction to intentional or knowing actions, no instruction on malice was necessary. We thus find no error.

For her sixth issue on appeal, Tyler posits that the trial court interrupted her counsel's closing argument and engaged the jury in a lengthy soliloquy on the law. Tyler contends that her counsel was only attempting to read the text of the aggravated assault statute to the jury, and that the trial judge's actions reflected a hostility to her and her counsel that resulted in prejudice to her. Tyler's Brief at 19.

We are unable to conduct meaningful appellate review of this claim because the closing arguments of counsel were not transcribed and thus are not part of the certified record on appeal. *See* N.T., 8/20/2013, at 109 ("Whereupon closing arguments were stenographically taken but not transcribed"). Consideration of Tyler's claim would, at a minimum, require this Court to review her counsel's closing argument and the controverted interruptions by the trial court to determine if counsel preserved the issue for appeal and, if so, whether the interruptions were necessary, warranted, and/or prejudicial. Because the absence of a transcript precludes us from doing so, we may not grant any relief on this issue.

For her seventh issue on appeal, Tyler argues that the Commonwealth failed to present sufficient evidence to support the convictions for aggravated assault and conspiracy on March 19, 2012. In particular, Tyler posits that the Commonwealth did not disprove her self-defense defense. On appeal, she contends that the evidence at trial showed that after the fight on March 18, 2012, Thompson later appeared on the street with a gun,

and that as a result the next day she (Tyler) had reason to fear for her life on March 19, 2012. Tyler's Brief at 25. Tyler further argues that she had no duty to retreat on the 19th after she saw Thompson fighting with her sister Kiera and came to Kiera's aid. *Id.* Finally, Tyler claims that there was no evidence of any agreement with anyone to commit aggravated assault. *Id.*

We are guided by the following standard of review when presented with a challenge to the sufficiency of the evidence supporting a defendant's conviction:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most

- 25 -

> favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (quoting *Commonwealth v. Pettyjohn*, 64 A.3d 1072, 1074 (Pa. Super. 2013) (citations and quotation marks omitted)).

If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt. *Commonwealth v. Rivera*, 983 A.2d 1211, 1221 (Pa. 2009). "Although the Commonwealth is required to disprove a claim of self-defense ... a jury is not required to believe the testimony of the defendant who raises the claim." *Commonwealth v. Houser*, 18 A.3d 1128, 1135 (Pa. 2011) (quoting *Commonwealth v. Carbone*, 574 A.2d 584, 589 (Pa. 1990)).

With respect to the charge of aggravated assault on March 19, 2012, we agree with the Commonwealth that Tyler did not present a self-defense defense. Instead, in her direct testimony, Tyler flatly denied that she hit Thompson or slammed her head into the wall. N.T., 8/20/2013, at 62 ("Q. Did you slam her face against a wall? A. No, I did not."). As reflected in its verdict, the jury obviously disbelieved this testimony, finding instead that Tyler attacked Thompson, not for purposes of protecting herself but with the intention to inflict serious bodily harm. Similarly, with respect to conspiracy,

it was within the jury's province to believe the evidence introduced by the Commonwealth, namely that Tyler and her sisters organized a crowd of up to 30 people to attack Thompson's family (during which melee Tyler twice slammed Thompson's head into a wall).  N.T., 8/19/2013, at 37, 68 69.  This evidence was sufficient to establish a conspiracy.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/14/2015