J-A13020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER D. KUHN | : | |
| | : | |
| Appellant | : | No. 2775 EDA 2018 |

Appeal from the Judgment of Sentence Entered August 27, 2018
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0007755-2017

BEFORE:   SHOGAN, J., NICHOLS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED SEPTEMBER 12, 2019**

Appellant Christopher D. Kuhn appeals from the judgment of sentence imposed following a bench trial and his convictions for third-degree murder, driving under the influence of a controlled substance (DUI), and failing to use child safety restraints,[1] among other offenses.  Appellant claims the evidence was insufficient to establish that he acted with malice.  Appellant also contends the trial court erred in denying his motion to suppress evidence obtained from his medical records and blood samples.  We affirm.

The convictions arise from an incident during which Appellant drove away from a theft at a Walmart and was struck by another vehicle as he proceeded through a red light.  Appellant's two-year old son, Qadan Trievel

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c); 75 Pa.C.S. § 3802(d)(1)(ii)-(iii); and 75 Pa.C.S. § 4581(a)(1)(i), respectively.

(child), was ejected from Appellant's car during the crash and suffered fatal injuries. The trial court summarized the trial evidence as follows:

> On Tuesday, October 3, 2018, at approximately 12:00 p.m., Appellant was at the Wal-Mart located in 180 Levittown Parkway, Bucks County, PA, with his child . . . . At the time, the child was seated in the front part of Appellant's shopping cart. Appellant wore a grey hooded sweatshirt and jeans. According to the Walmart Asset Protection Officer Ronald Cromwell (herein "APO"), Appellant selected a Vizio sound bar from the shelf, valued at $228, placed the item into his shopping cart, and walked towards the store exit without attempting to pay for the item. The APO testified that he observed Appellant pacing, that he looked at the doors numerous times, before finally grabbing the shopping cart with his son and walking past all points of sale. Appellant did not attempt to pay for the Vizio sound bar.
>
> Once Appellant passed all points of sale, the APO attempted to stop him but Appellant refused, telling the APO "you can't hold me here[."] Appellant then removed the child from the cart, left the store, and walked to his vehicle, a gold Jeep Liberty. When Appellant left the store, the APO called police dispatch and reported the retail theft.
>
> Witnesses observed Appellant put the child in the back seat of his vehicle but did not observe Appellant buckle the child in or place him in a safety seat. An eyewitness, Sandor Marshall, witnessed the events from the time Appellant left the store to the time he drove off; he corroborated the APO's testimony. Mr. Marshall testified that he saw Appellant "hustle" his child into the vehicle and closed the car door not a second later. Th[e trial c]ourt also heard from Dr. Erika Williams, qualified by th[e c]ourt as an expert in the field of forensic pathology. Dr. Williams performed the autopsy on the child and prepared an autopsy report. Dr. Williams testified that the injuries sustained by the child in the subsequent car crash were not consistent with those she would expect to see if the child was strapped in a car seat.
>
> Appellant took the time to take off his gray hoodie and place it over the rear license plate of his vehicle.
>
> After Appellant concealed his license plate, he drove away at a "high rate of speed[."] Mr. Marshall testified that Appellant pulled away so fast that he thought the vehicle was going to "turn over."

Phone video taken by Mr. Marshall, entered into evidence as C14, shows Appellant's vehicle screeching as he pulled out of the parking lot. Officer John Finby, who was dispatched to Wal-Mart for the retail theft, observed Appellant speeding and remarked that he would have ticketed Appellant for speeding had he not been responding to the retail theft.

As he was driving out of the shopping center, Appellant failed to stop at two stop signs and only came to a rolling stop when a car cut off his lane of traffic. Appellant then drove down Route 13 towards the next intersection at a high-rate of speed, ran through a steady red light, and collided with a vehicle who had the right of way. Appellant tried to swerve his vehicle through traffic but failed. The collision caused Appellant's vehicle to rotate clockwise, tip over onto the driver's side, and slide down the intersection. Appellant's vehicle then hit a stationary vehicle at the other end of the intersection, causing Appellant's vehicle to roll back onto its wheels and finally come to a stop. The collision caused the child to be ejected from Appellant's vehicle.

Officer Justin Grotz was also dispatched to the Wal-Mart for the retail theft, arriving a minute o[r] two after the APO's call. Officer Grotz's patrol dash cam, entered into evidence as Exhibit C30, shows Appellant's vehicle coming out of the Wal-Mart complex as the officers were driving to the complex. The video shows Officer Grotz turning back towards the intersection when flagged down by Wal-Mart's APO and, arriving at the scene of the crash not a minute later. The patrol dash cam video shows that the intersection where the crash occurred was a busy intersection with at least a dozen vehicles.

Th[e trial c]ourt heard from Detective Timothy Fuhrmann, qualified by th[e c]ourt as an expert in motor vehicle inspections. Detective Fuhrmann inspected the vehicles involved in the crash after-the-fact and opined that the vehicles had no malfunctions or pre-existing conditions, safety or mechanical, that could have contributed to the crash.

Th[e trial c]ourt heard from Sergeant Paul Shallcross, qualified by th[e c]ourt as an expert in the field of crash reconstruction. Sergeant Shallcross testified that the striations in the tire marks on the roadway showed that Appellant's tires were still rotating as they were sliding sideways, confirming that Appellant did not brake when crossing the intersection. The road on that day was sunny, bright, warm, and clear; there were no visibility issues that

could have contributed to the crash. Instead, Sergeant Shallcross opined that the cause of the crash was Appellant running through the steady red traffic signal.

Th[e trial c]ourt also heard from Dr. Gary Lage, qualified by th[e c]ourt as an expert in the field of toxicology. Dr. Lage reviewed the lab reports and medical records associated with Appellant after the collision. Dr. Lage found that the lab reports showed Appellant had Delta 9 Carboxy THC and Oxycodone in his system. However, Dr. Lage opined that Appellant was not impaired at the time of the collision. The paramedic that assisted Appellant on that day also testified that Appellant did not exhibit any signs of intoxication.

Appellant jumped out of his vehicle after the collision. Witnesses saw Appellant pace back and forth, look at the child on the roadway, start pacing once more, and finally flee the scene. Appellant did not render aid to the child nor call for anybody to help the child.

While the police arrived at the intersection, Appellant was fleeing from the scene and ran until he was no longer visible from the scene. The police were flagged down by bystanders and told the direction where Appellant had fled. The police found Appellant in a nearby tree line, placed him in custody, and escorted him back to the scene.

The police and paramedics attempted life-saving measures on the child, but he was unresponsive. The child was pronounced dead at the hospital. Dr. Erika Williams, who performed the autopsy on the child, opined that the cause of death of the child was head injuries consistent with being ejected from a vehicle and landing on a roadway.

Appellant was transported to Aria Hospital in Langhorne, Bucks County for diagnosis and treatment of injuries. That same day, Sergeant Phil Kulan, of the Tullytown Borough Police Department, submitted an affidavit of probable cause requesting a search warrant for Appellant's medical records from Aria Hospital, and subsequently, to draw Appellant's blood. While at the hospital, a warrant was served on Appellant for blood and chemical testing. Th[e trial c]ourt received by way of stipulation the Toxicology Report as Exhibit C31, the search warrant to secure the blood as Exhibit C32, and the Analysis Requisition and Chain of Custody form as Exhibit C33. . . .

It was further established by way of stipulation that on the day of the crimes, Appellant had a New Jersey driver's license that was suspended, and that Appellant was aware of the license suspension.

Trial Ct. Op., 11/9/18, at 2-8 (record citations and footnotes omitted).

Appellant was charged on the same day as the accident. The Commonwealth filed a thirteen-count information against Appellant, but subsequently amended the information to include a fourteenth count for failure to use a child restraint system. Appellant filed an omnibus pre-trial motion to (1) preclude evidence of his failure to use a child restraint system[2]

---

[2] Section 4581 of the Vehicle Code states, in relevant part:

**(a) Occupant protection.—**

(1)(i) Except as provided under subparagraph (ii), any person who is operating a passenger car, Class I truck, Class II truck, classic motor vehicle, antique motor vehicle or motor home and who transports a child under four years of age anywhere in the motor vehicle, including the cargo area, shall fasten such child securely in a child passenger restraint system, as provided in subsection (d) [defining standards for child passenger restraint systems].

* * *

**(f) Criminal proceedings.—**The requirements of this subchapter or evidence of a violation of this subchapter are not admissible as evidence in a criminal proceeding except in a proceeding for a violation of this subchapter. No criminal proceeding for the crime of homicide by vehicle shall be brought on the basis of noncompliance with this subchapter.

75 Pa.C.S. § 4581(a)(1)(i), (f).

and (2) suppress Appellant's medical records from Aria Hospital and the toxicology results obtained from the blood samples taken at Aria Hospital. Omnibus Pre-Trial Mot., 2/6/18, at 6-8.

On March 19, 2018, the trial court granted, in part, Appellant's motion to preclude[3] and denied Appellant's motion to suppress. Trial Ct. Order & Op., 3/19/18, at 9, 16. As to Appellant's suppression motion, the trial court found the relevant affidavits of probable cause, which we discuss in further detail below, "describe[d] repeated situations where [Appellant] appeared to be acting with impaired judgment." *Id.* at 9. The trial court concluded the affidavits provided "probable cause to conclude that there was a 'fair probability' that evidence relevant to the crime of homicide by vehicle could be found in the medical records of [Appellant]'s treatment immediately following the accident." *Id.* Lastly, the trial court noted the searches "were limited in scope." *Id.*

Appellant proceeded to a non-jury trial at which the trial court convicted him of all charges. On August 27, 2018, the trial court sentenced Appellant to serve an aggregate term of eight-and-a-half to thirty years' imprisonment and a sixteen-year probationary term.

_____

[3] Specifically, the trial court permitted the Commonwealth to introduce evidence related to Appellant's failure to secure the child in a child seat for the limited purpose of proving an offense under Section 4581(a)(1)(i). Trial Ct. Order & Op., 3/19/18, at 15. The trial court also ruled the evidence would not be admissible to determine whether Appellant acted with malice. *Id.*

Appellant timely filed a notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement challenging (1) the sufficiency of the evidence for third-degree murder and (2) the trial court's determination that there was probable cause to obtain Appellant's medical records and blood samples. *See* Appellant's Rule 1925(b) Statement, 10/12/18, at 1.

The trial court filed a Rule 1925(a) opinion. The trial court explained its finding that Appellant acted with malice as follows:

> This is not a case of ordinary recklessness that arises when a driver purposely violates traffic rules. Appellant was fleeing the scene of a crime, more worried about evading capture than the lives of others, and sped through a red light in a busy intersection without honking his horn, putting his hazards on, or taking any defensive safety measures. Appellant did not even try to brake; instead he tried to swerve his way out of the busy intersection and hoped he would make it. Appellant's unwillingness to brake or use any safety measures, in light of all the circumstances, was a level of recklessness greater than ordinary recklessness; his actions showed a conscious disregard of an unjustifiable and substantial risk of harm.
>
> Appellant's child was in the backseat, not old enough to have any protective instincts in the event of a crash. The child had no say in where he was taken and in what manner. Appellant hoped that he and his child would come out of the intersection without incident in callous disregard of the lives of others. Unfortunately, there was a collision, and the child was killed.
>
> The fact that Appellant was not impaired on that day supports the conclusion that Appellant knew of the unjustifiably high risk of injury his conduct created, but chose to disregard it for the sake of evading capture. The day was sunny, bright, and warm. There was no impairment, neither toxic nor sensorial, that would have prevented him from seeing the busy intersection. Appellant weighed the risk of harm to his child and others against his own interests and chose his own interests over the risk to others. Appellant intentionally sped through a red light, hoping that he could dart past the vehicle that had the right of way. Even after

the collision, Appellant was so worried about evading capture that he fled the scene, abandoning his child in the street.

Trial Ct. Op., 11/9/18, at 13. The trial court adopted its prior order and opinion denying Appellant's motion to suppress as dispositive of Appellant's other issue on appeal. *See id.* at 9.

Appellant presents the following questions for our review:

[1]. Whether the evidence at trial was insufficient to establish the element of malice as required for proof of the offense of murder of the third degree?

[2]. Whether the trial court erred in denying [Appellant]'s motion to suppress the medical records and blood test results, where said evidence was obtained as a result of two defective search warrants not supported by probable cause?

Appellant's Brief at 4.

Appellant first challenges the sufficiency of the evidence that he acted with malice. *Id.* at 13. Appellant asserts the trial evidence fell short of demonstrating a "sustained, purposeful recklessness necessary to prove a knowing and conscious disregard that death or serious bodily injury was reasonably certain to occur." *Id.* at 17 (citation and quotation marks omitted). According to Appellant:

[he] made a series of bad decisions, and his actions resulted in the tragic and accidental death of his two-year old son. But malice as defined by the Pennsylvania Courts is not supported by the facts of this case. Ultimately, this was an accident, and the facts presented at trial do not give rise to malice, as required to sustain a conviction for third degree murder.

*Id.* at 13.

In support, Appellant argues his conduct was not so egregious as to establish an indifference or a disregard for human life. *Id.* at 19-20. Appellant notes the Commonwealth did not present evidence he was driving over the speed limit at the time of the accident. *Id.* at 24. Appellant also emphasizes it was possible the traffic signal at the intersection was yellow or only just turned red. *Id.* at 25-26. Appellant contends there was no indication he saw the car that struck his vehicle entering the intersection. *Id.* at 25. Appellant also suggests he nearly crossed the intersection safely, as it was merely the right rear tire assembly of his vehicle that was struck. *Id.* at 26.

Further, Appellant asserts that "[i]t is inaccurate to assert that he displayed no concern for the safety of his child." *Id.* at 22. Appellant argues it is improper to consider the evidence of his failure to secure the child into a child seat in light of the trial court's pre-trial ruling limiting the purpose of such evidence. *Id.* at 21. Instead, Appellant alleges he placed the child in a child seat that was properly secured to the backseat of the vehicle. *Id.* at 22. Appellant also acknowledges the fact that he had controlled substances in his system, but emphasizes there was no proof he was impaired. *Id.* at 28-29. Lastly, Appellant contends his license suspension and his flight from the scene of the accident should not factor into a finding of malice. *Id.* at 30, 35.

The following principles govern our review of Appellant's argument:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh

the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Thompson*, 106 A.3d 742, 756 (Pa. Super. 2014) (citation omitted) (emphasis omitted). A challenge to the sufficiency of the evidence "presents a question of law for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Packer*, 168 A.3d 161, 166 (Pa. 2017) (citation omitted).

This Court has stated:

Murder in the third degree is an unlawful killing with malice but without the specific intent to kill. 18 Pa.C.S.[] § 2502(c). Malice is defined as:

[A] "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. . . .["] [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

Malice may be inferred by considering the totality of the circumstances.

*Commonwealth v. Dunphy*, 20 A.3d 1215, 1219 (Pa. Super. 2011) (some citations omitted).

> In *Packer*, the Pennsylvania Supreme Court noted that
>
> a person who acts negligently or with ordinary recklessness to cause a person to suffer serious bodily injury or death has not committed third-degree murder . . . . One legal scholar has defined the point of demarcation for malicious conduct under Pennsylvania law as "dangerousness"—"the . . . act creates such a dangerous situation" that the resultant deaths or serious bodily injuries "are products of malice." . . . "Malice asks for a solemn, societal judgment about whether [the defendant] was responsible for [a death or serious bodily injury] by bringing about a situation so unnecessarily dangerous to human life that empowering government to exercise its most ominous authority is the only rational societal response."

*Packer*, 168 A.3d at 169 (citations omitted). The *Packer* Court compared malice to "the decision to play Russian roulette." *Id.* at 172. In such cases, the Court noted, there is an intentional action in callous disregard of the likely harmful effects on others and a virtual guarantee that some manner of accident will occur. *See id.*

Pennsylvania courts recognize that car "crashes seldom give rise to proof of the malice needed to sustain a conviction for third degree murder or aggravated assault." *See Commonwealth v. Moyer*, 171 A.3d 849, 853 (Pa. Super. 2017) (citation omitted), *appeal denied*, 184 A.3d 148 (Pa. 2018); *see generally Commonwealth v. Bruce*, 916 A.2d 657, 664 (Pa. Super. 2007) (noting that recklessness for the purpose of aggravated assault is equivalent to malice necessary for third-degree murder). However, this Court has stated that "a conviction based on malice is appropriate where evidence

demonstrates the element of **sustained recklessness** by a driver in the face of **an obvious risk of harm** to his victims." ***Commonwealth v. Kling***, 731 A.2d 145, 149 (Pa. Super. 1999) (emphasis in original).

The Pennsylvania Supreme Court, in ***Commonwealth v. Comer***, 716 A.2d 593 (Pa. 1998), discussed the distinction between recklessness and malice as follows:

> In [***Commonwealth v. O'Hanlon***, 653 A.2d 616 (Pa. 1995)], the defendant, while severely intoxicated, drove his vehicle through a red light and struck another vehicle. Both the defendant and the driver of the other vehicle were seriously injured.
>
> In reversing the conviction for aggravated assault, we found that there was an increased degree of recklessness required by the aggravated assault statute, *i.e.*, reckless "under circumstances manifesting extreme indifference to the value of human life."
>
> \* \* \*
>
> [W]e noted that examples of recklessness in which life threatening injury is essentially certain to occur include firing a gun into a crowd, or driving a vehicle into a crowd after having aimed the vehicle at a particular individual.
>
> \* \* \*
>
> The Commonwealth argues that this case is controlled by ***Commonwealth v. Scofield***, [521 A.2d 40 (Pa. Super. 1987)], where the defendant's aggravated assault conviction was sustained when it was established that he drove his vehicle in an erratic manner after consuming a small amount of alcohol and ingesting drugs. Although superficially similar, the case is factually distinguishable.
>
> In ***Scofield***, the defendant was driving his vehicle and scraping his car against the bumper of a vehicle parked on the street. Sparks were flying and the defendant travelled another ten feet in this manner before swerving onto the sidewalk and striking a building. A nearby cabdriver realized that the defendant had struck a pedestrian, who was under the right fender of the

defendant's vehicle. The cabdriver directed the defendant to turn the car off and even attempted to reach into the car to remove the keys from the ignition. The defendant became belligerent, hit the cabdriver and attempted to bite him. The defendant then unsuccessfully tried to put his car into reverse, but a flat tire prevented his flight. As a result of the incident, the pedestrian's leg was amputated.

Although the defendant's BAC was only .004, a drug test revealed two different types of barbiturates in his urine. Furthermore, the officer at the scene testified that the defendant had an odor of alcohol on his breath, spoke with a thick tongue, had a hard time standing and had to be helped away from the vehicle.

The Superior Court concluded that the record was replete with evidence that the defendant operated his car in an **intentionally** reckless manner. It noted that the defendant repeatedly scraped his car against parked vehicles, and that he had no regard for the victim's plight when confronted with the situation. The court found that the defendant's behavior prior to and after the accident established that he was aware of his reckless conduct. Thus the defendant considered, then disregarded, the threat to the life of the victim. These circumstances demonstrate a higher degree of recklessness than those presented in the instant case.

*Comer*, 716 A.2d at 595-97 (citations and footnote omitted) (emphasis in original).

The *Comer* Court ultimately concluded the Commonwealth, in that case, failed to establish the defendant acted with malice:

Applying the aforementioned law to the facts of this case, we find that the Commonwealth did not establish that [the defendant] possessed the state of mind equivalent to that which seeks to cause injury. The evidence established that [the defendant] was driving at an excessive rate of speed after consuming four or five beers and ingesting at least one "downer" at some time prior to the accident. While [the defendant]'s actions are clearly criminal, they do not constitute aggravated assault.

\* \* \*

- 13 -

In contrast [to **Scofield**], [the defendant in **Comer**] sped past another vehicle, his car rubbed the curb of the sidewalk and the accident ensued immediately thereafter. The fact that both [the defendant in **Comer**] and the defendant in **Scofield** drank alcohol and ingested some amount of a controlled substance is not controlling. As we find [the defendant]'s conduct more akin to that which occurred in **O'Hanlon**, we reverse his conviction for aggravated assault.

**Id.** at 596-97.

More recently, in **Thompson**, this Court affirmed a defendant's conviction for third-degree murder. **Thompson**, 106 A.3d at 757. This Court concluded sufficient evidence established malice under the following circumstances:

At the time of this incident, [the defendant] was driving at a high rate of speed (55–61 miles per hour in a 30–40 miles per hour zone), while under the influence of marijuana, in an attempt to flee from [a police officer's] pursuit. [The defendant] fled [the officer]'s initial traffic stop at a high rate of speed and proceeded through a steady red light, fatally striking two young pedestrians. Upon being struck, [the pedestrians] were propelled from 50 to 100 feet. Instead of stopping at the scene of the accident, [the defendant] fled, abandoned the vehicle involved in the accident, and hid from police. There were no adverse weather conditions during this time that impeded [the defendant]'s sight or precluded him from stopping after the accident. These actions demonstrate a complete disregard of the unjustified and extremely high risk that his actions would cause death or serious bodily injury.

**Id.** (record citations omitted).

In sum, Pennsylvania case law recognizes the occurrence of a fatal car crash itself will not sustain a conviction for third-degree murder. **See Moyer**, 171 A.3d at 853. Moreover, the fact that a defendant was intoxicated or violated traffic laws immediately before causing a crash will not establish

malice. *See Comer*, 716 A.2d at 597; *see also Commonwealth v. McHale*, 858 A.2d 1209, 1211-12 (Pa. Super. 2004) (holding that the evidence was insufficient to establish the defendant acted with malice when after he consumed a large amount of alcohol at a bar, he drove without a valid license, sped through the parking lot of the bar onto the roadway, struck a parked car and two people standing near the car, and then drove off to his home). *But see Packer*, 168 A.3d at 172 (noting that "[t]here is a significant difference between deciding to drive while intoxicated and deciding to drive with knowledge that there is a strong likelihood of becoming unconscious").

The essence of malice in the context of a car crash is the extreme nature of the risk and whether the defendant intentionally acted despite an awareness of the risk. *See Packer*, 168 A.3d at 172. The totality of the circumstances, including a defendant's conduct before, during, and after an accident, may establish malice. *See Comer*, 716 A.2d at 596-97; *accord Packer*, 168 A.3d at 171; *Dunphy*, 20 A.3d at 1219. Furthermore, "fleeing the scene may be considered in determining if an individual acted with malice." *Dunphy*, 20 A.3d at 1220 n.3 (citations omitted). No one factor, including intoxication or flight, is necessary or sufficient to a finding of malice. *See McHale*, 858 A.2d at 1211-12; *Commonwealth v. Scales*, 648 A.2d 1205, 1207 (Pa. Super. 1994).

Instantly, Appellant was in the Walmart with his child seated in the front of the shopping cart. N.T., 3/26/18, at 18-20. Appellant placed the Vizio sound bar in the shopping cart and left the store without paying for it. *Id.*

When Walmart's APO, Mr. Cromwell, stopped Appellant in the vestibule of the store, Appellant defied Mr. Cromwell's request to speak with him, picked up his child, and went out to the parking lot. *Id.* at 22-23. Mr. Cromwell followed Appellant outside. *Id.* at 23. In the parking lot, Mr. Cromwell saw Appellant place his child in the backseat of his car, take off his sweatshirt, use the sweatshirt to cover his license plate, and then get into the driver's seat and drive away at a high rate of speed. *Id.* at 26.

When driving out of the Walmart parking lot, Appellant failed to come to a complete stop at two stop signs. *Id.* at 26, 41-42; Ex. C14. As Appellant turned out of the parking lot and onto an access road, the wheels of his car screeched, and the car leaned over to the point where one witness thought the car would tip over. *See* N.T., 3/26/18, at 41-42; Ex. C14.

Meanwhile, Officers Finby and Grotz, who were in separate marked police vehicles, responded to the reported theft at the Walmart. As the officers were driving on the access road from Route 13 to the Walmart, they passed Appellant's car, which was on the opposite side of the road, moving toward Route 13. *See* Ex. C30. Officer Finby stated Appellant was driving at a high rate of speed and he would have ticketed Appellant if he was not responding to the theft. N.T., 3/26/18, at 160-61. Approximately ten seconds after passing Appellant's vehicle, the officers received a broadcast describing Appellant's car, and Officer Grotz turned around to pursue Appellant. *See* Ex. 30. By the time Officer Grotz turned around, Appellant had exited the shopping center onto southbound Route 13. *See id.*

Officer Grotz drove back down the access road and exited the shopping center onto southbound Route 13. *Id.* The crash occurred seconds after Officer Grotz turned onto Route 13, and Officer Grotz was not able to see the crash itself. N.T., 3/26/18, at 141; *see also* Ex. C30. Moreover, there was no indication that Officer Grotz saw Appellant when he was driving on Route 13.

As to the crash, Lisa Gabrielson was on northbound Route 13, opposite Appellant's direction of travel. N.T., 3/26/18, at 88. Ms. Gabrielson testified that the light was initially green, and she intended to turn left into the shopping center. However, the light turned red, and she stopped. *Id.* at 87-88. At that time, she was in the second car in the left turn lane. *Id.*

According to Ms. Gabrielson, the light for the cross-traffic coming out of the shopping center turned green, and she saw a car that was exiting the shopping center start moving. *Id.* at 88. Ms. Gabrielson indicated she saw Appellant come to the intersection, slow down, and then speed through. *Id.* at 110. She emphasized that Appellant would have had a red light. *Id.* at 88, 90-91.

Fernando Campos was the driver of the vehicle that struck Appellant's car. Mr. Campos was stopped on the roadway exiting from a Home Depot onto Route 13. *See* Ex. C30. Mr. Campos was on the right of Appellant's direction of travel on southbound Route 13. *See id.* Mr. Campos testified that he had a green light and started to enter the intersection to turn when Appellant "came fast" through the intersection. N.T., 3/26/18, at 75. Mr.

Campos indicated he did not see Appellant until the last second and was unable to brake before the crash. *Id.* at 83. According to Mr. Campos, Appellant "tried to avoid" an accident. *Id.* at 83; *see also* Ex. D1.

Mr. Campos's vehicle struck Appellant's car near Appellant's right rear wheel. N.T., 3/26/18, at 190. Appellant's car spun around then flipped onto its side. *Id.* at 190-191. Appellant's car continued forward and struck the first car in the left turn lane opposite Appellant's direction of travel. *Id.* at 191; *see* Ex. C30. The second impact caused Appellant's car to flip back over onto its wheels. N.T., 3/26/18, at 191. Appellant's car came to rest on its wheels near the centerline of Route 13, but was facing northbound. *See* Ex. C30.

Although Mr. Campos testified that Appellant tried to avoid the crash, the record established that Appellant did not brake. N.T., 3/26/18, at 198-99. Moreover, the weather was clear and there were no obstructions of the traffic signal or the traffic at the intersection. *Id.* at 189; *see* Ex. C30. There were numerous cars at the intersection. *See* Ex. C30.

After the crash, Appellant exited his car and saw his child's body. Appellant did not assist his child or call for help. Instead, he paced back and forth and then ran away from the scene. N.T., 3/26/18, at 107, 114-15, 120, 142. Officer Finby ran after Appellant through a line of trees around a parking lot near the accident scene. *See* Ex. C30. Officer Finby ultimately found Appellant sitting in "kind of high weeds" with his back to the officer and his arms over his knees. N.T., 3/26/18, at 157. Officer Finby ordered Appellant

to lie down, and Appellant complied. *Id.* After taking Appellant into custody, Officer Finby described Appellant as cooperative "[t]o a point[,]" but stated Appellant did not want to go back to the scene of the crash. *Id.*

Therefore, the record, when viewed in a light most favorable to the Commonwealth, supported each of the findings of the trial court. *See Thompson*, 106 A.3d at 756. Appellant set in motion a series of events when he decided to steal the Vizio sound bar with his child present. *See* Trial Ct. Op., 11/9/18, at 12. Appellant demonstrated an intent to avoid any contact with the police. *See id.*; *Thompson*, 106 A.3d at 757. Appellant refused Mr. Marshall's request to remain at the Walmart and instead rushed his child into the backseat of the car. *See* Trial Ct. Op., 11/9/18, at 12. Appellant, however, took the time to conceal his license plate, after which he exited the Walmart parking lot while driving in an erratic manner and failing to stop at two stop signs. *See id.*

Moments later, Appellant then ran a red light into a busy intersection without any warning. *See id.* at 12-13; *Thompson*, 106 A.3d at 757. Appellant had a clear view of the intersection. *See Thompson*, 106 A.3d at 757. Rather than braking when confronted with cross-traffic entering the intersection, Appellant tried to swerve in hopes of making it through the intersection unscathed. *See* Trial Ct. Op., 11/9/18, at 13. Then, when seeing his child on the pavement after the crash, Appellant fled rather than staying with his child and seeking any aid. Although Appellant challenges the findings

of fact and inferences drawn by the trial court, this Court will not reweigh the evidence.[4]  **See Thompson**, 106 A.3d at 756.

We further conclude that the trial court appropriately considered the totality of the circumstances surrounding the crash.  **See Thompson**, 106 A.3d at 757; **accord Packer**, 168 A.3d at 171; **Dunphy**, 20 A.3d at 1219. Moreover, having considered the totality of the circumstances, we conclude that this case falls closer to **Thompson** than **Comer** or **McHale**.  As noted by the trial court, Appellant "treated the intersection like a Russian roulette— driving in a manner and in such circumstances that he was 'virtually guaranteeing some manner of accident' through the 'intentional doing of an uncalled-for act in callous disregard' of its harmful effects on others."  **See** Trial Ct. Op., 11/9/18, at 12; **Packer**, 168 A.3d at 169.  Therefore, we discern no error in the trial court's conclusion that Appellant acted with malice.  **See Thompson**, 106 A.3d at 756-57; **accord Packer**, 168 A.3d at 169.

Appellant next contends the trial court erred in denying his motion to suppress the evidence obtained from his medical records and blood samples.

---

[4] Because the trial court did not determine Appellant was impaired at the time of the accident or failed to properly restrain his child inside the child seat, we need not address Appellant's arguments regarding those factors.  However, we add that the Pennsylvania Supreme Court has instructed that a review of the sufficiency of the evidence must consider an undiminished record.  **See Commonwealth v. Lovette**, 450 A.2d 975, 977 (Pa. 1982) (noting that "a claim of insufficiency of the evidence will not be assessed on a diminished record, but rather on the evidence actually presented to the finder of fact rendering the questioned verdict").  To the extent we were to consider the evidence that Appellant did not restrain his child properly, such evidence would only bolster the conclusion that Appellant acted with malice under the circumstances of this case.

By way of background to this claim, we note that following the accident, Appellant was taken to Aria Hospital. Thereafter, officers prepared two applications for search warrants. In the first application, officers sought Appellant's medical records, "[i]ncluding but not limited to, [a] blood toxicology report." Application for Search Warrant and Authorization, 10/3/17 (6:30 p.m.). The affidavit of probable cause in support of this application read:

> 1. Your affiant Sgt. Phil Kulan #22 is Pennsylvania Act 120 State Certified, Sworn Municipal Police Officer, employed by the Tullytown Borough Police Department in Bucks County, Pennsylvania, Sgt. Kulan has be [sic] duly sworn since 2007.
>
> 2. Sgt. Kulan has also investigated numerous crashes, including DUI related crashes, and a fatal struck pedestrian.
>
> 3. On Tuesday, October 3, 2017, at approximately 12:13 hours, Tullytown Police were dispatched to Walmart, 180 Levittown Parkway, Levittown, PA 19055, for a retail theft in-progress involving [Appellant]. [Appellant] was holding a baby and was last reported walking away from loss prevention due to passing all points of sale without paying for the merchandise.
>
> 4. This statement received from Walmart Asset Protection Associate Ronald Cromwell, Cromwell advised of the following during the investigation.
>
> > . . . I then approached the subject [(Appellant)] and I identified myself as Asset Protection and asked the subject to come with me to the security office. The subject then picked up the baby from the shopping cart and said to me you can't hold me here. The subject then proceeded to walked [sic] outside down the front of the building towards 5 Below. I then notified bucks county dispatch of the situation. The subject then walked over to a gold jeep and removed his grey hoodie and placed it over his NJ license plate that he had on the back of the jeep. The subject then placed his son in the jeep and pulled off. . . .

\*   \*   \*

6. Upon police arrived [sic] at this location, officers were advised by Loss Prevention that the male had entered a vehicle, a gold in color SUV, and fled the parking lot of Firestone onto Southbound Route 13.

\*   \*   \*

8. Police turned around and also entered Route 13 Southbound and observed a crash had just taken place at the intersection of Rt.13 and Exit 4.

9. Upon arriving at the intersection, Police were directed to a black male[, *i.e.*, Appellant], fleeing the scene of the crash, towards the Jug Handle. Police pursued on foot and subsequently placed one male into custody.

10. Police asked [Appellant] where the baby was and [Appellant] stated "back there", meaning the accident scene.

11. Ofc. Grotz advised that there was an infant unresponsive lying in the roadway, near the gold SUV at the scene of the crash.

12. [Appellant] was placed into the rear of police vehicle 71-07 and Ofc. Finby assisted in the care of the infant.

13. The infant was an obvious class 5, however, CPR was initiated, and stopped when relieved by Medic 154. Ofc. Finby drove the ambulance to Lower Bucks Hospital for treatment for the infant.

14. The investigation revealed that [Appellant] had fled in the gold SUV onto Route13 Southbound and headed towards Exit 4 and proceeded into the intersection, against a steady red traffic signal.

15. At that intersection, the gold SUV was contacted [by] another vehicle, causing the gold SUV to rotate and roll over, causing the infant to be ejected from the vehicle and land on the roadway.

16. The victim, an unidentified approximate 2-year-old male, was transported to Lower Bucks Hospital . . . however, the infant was pronounced deceased a short time later.

17. Eyewitness accounts indicate [Appellant], the driver of the gold SUV was driving reckless manner [sic], and in their opinion caused this crash.

18. Your affiant, Sgt. Kulan spoke to another witness at police HQ who described the suspect letting the child climb into the vehicle and then he covered the license plate to the vehicle with a sweatshirt. The witness provided that the child got into the Gold Jeep in the rear driver's side door. The witness did not see [Appellant] secure the child into the child safety seat, which was later located in the back seat.

19. A certified driver's abstract was obtained from New Jersey and it indicated that [Appellant]'s New Jersey License is suspended.

20. While [Appellant] was detained in the backseat of the police vehicle on scene, he was non-responsive and uncooperative with police questions regarding the incident. Investigation revealed that after impact, the suspect got out of the passenger side of the vehicle, walked around to the driver's side of the vehicle, and looked at the child before running off.

21. [Appellant] was transported to Aria Bucks Hospital for treatment following the crash. Based on the above factual information, and the fatality of a child victim, caused by [Appellant], your affiant believes that probable cause exists to obtain a search warrant for medical records from Aria Bucks Hospital, 380 N. Oxford Valley Rd., Langhorne, PA 19047, to further the investigation into the crash that caused the death of a child. These records are relevant to an on-going investigation into, 75 Pa.C.S. §3732, Homicide by vehicle.

Affidavit of Probable Cause, 10/3/17 (6:30 p.m.).  Officer Kulan obtained Appellant's medical records at 6:50 p.m.

At 7:15 p.m., officers applied for a second search warrant seeking "[a]ny and all blood evidence, including, but not limited to vials of drawn blood related to the treatment of" Appellant.  Application for Search Warrant, 10/3/17 (7:15 p.m.).  The affidavit of probable cause in support of the application was substantially identical to the first affidavit.  However, the second application revised Paragraph 21 and added Paragraph 22 such that the end of the second affidavit read:

21. [Appellant] was transported to Aria Bucks Hospital for treatment following the crash. A search was executed on October 3, 2017 and medical records were obtained from Aria Bucks Hospital. The medical records indicated that [Appellant] had Tetrahydrocannabinol in his system, which is a Schedule I controlled substance.

22. Based on the above factual information, and the fatality of a child victim, caused by [Appellant], your affiant believes that probable cause exists to obtain blood evidence, including but not limited to, vials of drawn blood, from Aria Bucks Hospital, 380 N. Oxford Valley Rd., Langhorne, PA 19047, to further the investigation into the crash that caused the death of a child. These records are relevant to an on-going investigation into, 75 Pa.C.S. §3732, Homicide by vehicle.

Affidavit of Probable Cause, 10/3/17 (7:15 p.m.). At 7:37 p.m., officers obtained a vial of Appellant's blood, which was subsequently tested, and revealed the presence of two controlled substances.

As noted above, Appellant filed a motion to suppress challenging the applications as being overbroad and for failing to establish probable cause to seize Appellant's blood samples. In short, Appellant claimed the Commonwealth unlawfully obtained the evidence that he had controlled substances in his system at the time of the accident.

The trial court denied Appellant's motion to suppress concluding:

[T]he [magisterial district judge] was confronted with a situation where it was reported that [Appellant] had engaged in a course of conduct which suggested that he was neither thinking nor acting with a sober clear state of mind. When he was approached by Ronald Cromwell, Walmart's [APO], he should have realized that he had been identified and that fleeing the scene with a child was both a poor and reckless decision. Having made that one bad choice, rather than driving carefully so as not to get caught, he drove through an intersection "against a steady red traffic signal" at a speed which caused an accident with sufficient force to cause

his vehicle to roll over and eject the child from the car. An independent witness stated that [Appellant] had been driving in a reckless manner and caused the accident. The probable cause affidavit further states that following that horrific event, and after seeing the child, [Appellant] fled the scene rather than immediately administer aid to the child. The allegations of fact in the probable cause affidavit describe repeated situations where [Appellant] appeared to be acting with impaired judgment. The specific factual history of events attributed specifically to [Appellant] provided [the magisterial district judge] with probable cause to conclude that there was a "fair probability" that evidence relevant to the crime of Homicide by Vehicle could be found in the medical records of [Appellant]'s treatment immediately following the accident. After those records were obtained, which disclosed that [Appellant] had Tetrahydrocannabinol in his system, which is a schedule I controlled substance, it was appropriate to issue the second warrant to obtain vials of drawn blood which had already been secured from [Appellant] previously by the hospital.

The searches were limited in scope and based on specific articulated facts which would cause a reasonable person to believe the searches were warranted based on the totality of the circumstances.

Trial Ct. Order & Op., 3/19/18, at 8-9.

On appeal, Appellant argues the affidavit of probable cause in support of the first application for a search warrant "failed to describe the items to be seized with the requisite specificity." Appellant's Brief at 39. Specifically, Appellant contends the request for "medical records from Aria Hospital" was overbroad. *Id.* Appellant further argues, "It is unclear, however, the specific information [Officer Kulan] expected to glean from the medical records, or why. Additionally, the affidavit failed to establish that [the officer] knew of, or even suspected, the contents of the Appellant's medical records [would contain additional evidence]." *Id.* at 39-41.

Moreover, Appellant asserts the first and second applications for search warrants "failed to articulate specific facts to establish probable cause to search for evidence of [driving under the influence]." *Id.* at 41. According to Appellant:

> There is no evidence cited in the affidavit that the affiant believed the Appellant to be under the influence of drugs or alcohol at the time of the accident, nor are there facts to support a finding that the Appellant suffered a medical emergency, causing the crash. Common indicators to support a finding of probable cause for a [driving under the influence] investigation include the presence of drugs, alcohol, or paraphernalia in the car, observations regarding the suspect's impaired speech or motor skills, or the odor of alcohol or marijuana. None of these reasons are listed in the affidavit.

*Id.* at 42. Appellant notes there were innocent explanations for his flight from the scene of the accident, as well as his non-responsiveness to police questioning after the accident, and the affidavits of probable cause failed to link his conduct to a reasonable belief that Appellant was intoxicated. *Id.* at 43. Appellant concludes:

> [T]he trial court incorrectly applied the standard for probable cause. Neither curiosity nor suspicion is sufficient to justify such an intrusion. The mere fact that one's actions are subjectively deemed to be unusual or confounding does not give rise to probable cause that they are under the influence of alcohol or . . . controlled substances.

*Id.* at 44.

It is well settled that

> [a]n appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual

findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

Additionally, the Pennsylvania Supreme Court has ruled that when reviewing a motion to suppress evidence, we may not look beyond the suppression record.

***Commonwealth v. Smith***, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citations and internal alterations omitted).

This Court has stated:

The Rules of Criminal Procedure include a particularity requirement: "Each search warrant shall be signed by the issuing authority and shall: . . . (c) name or describe with particularity the person or place to be searched." The Comment to Rule [205] explains: "Paragraphs (b) and (c) are intended to proscribe general or exploratory searches by requiring that searches be directed only towards the specific items, persons, or places set forth in the warrant[." . . . ]

The Pennsylvania Supreme [Court] has concluded Article 1, Section 8 of the Pennsylvania Constitution affords greater protection than the Fourth Amendment, including a more demanding particularity requirement; the description must be as particular as reasonably possible. "The twin aims of Article 1, Section 8 are the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause."

In order to protect these twin aims, a warrant must describe the place to be searched and the items to be seized with specificity, and the warrant must be supported by probable cause. The place to be searched must be described "precise enough to enable the executing officer to ascertain and identify, with reasonable effort the place intended, and where probable cause exists to support the search of area so designated a warrant will not fail for lack of particularity."

*Commonwealth v. Korn*, 139 A.3d 249, 253-54 (Pa. Super. 2016) (citations omitted).

"Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Leed*, 186 A.3d 405, 413 (Pa. 2018) (citation omitted). "Probable cause is based on a finding of probability and does not require a *prima facie* showing of criminal activity." *Commonwealth v. Huntington*, 924 A.2d 1252, 1256 (Pa. Super. 2007) (citation omitted). "[T]he police need not rule out all other possibilities in establishing probable cause for the issuance of a search warrant." *Commonwealth v. Rapak*, 138 A.3d 666, 672-73 (Pa. Super. 2016) (citation omitted).

As the Pennsylvania Supreme Court has stated:

The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . [concluding]" that probable cause existed.

*Commonwealth v. Housman*, 986 A.2d 822, 843 (Pa. 2009) (citation omitted). Moreover, in engaging in our review we are mindful that

> [t]he Supreme Court of the United States has instructed "that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." Indeed, a magistrate's probable cause determination should receive deference from the reviewing courts. In keeping with the Fourth Amendment's strong preference for warrants, "courts should not invalidate . . . warrants by interpreting affidavits in a hyper[-]technical, rather than a commonsense, manner."

*Leed*, 186 A.3d at 413 (citation omitted).

Following our review of the record, the trial court's order and opinion, and Appellant's arguments, we discern no basis to conclude the trial court erred in denying Appellant's motion to suppress. As the trial court noted, the first affidavit of probable cause indicated Appellant drove erratically, caused a car crash that resulted in the child being ejected from his vehicle, and then fled the scene without any apparent concern for the child. Based on these allegations, we agree with the trial court that the magistrate had a substantial basis to find a fair probability that Appellant's medical records from Aria Hospital could contain evidence regarding Appellant's conduct and state of mind before, during, and after the crash. *See Housman*, 986 A.2d at 843. We also find no basis to conclude that the application for the search was overbroad. *See Korn*, 139 A.3d at 253-54. Moreover, once officers obtained indications that Appellant had a controlled substance in his system, there was ample probable cause supporting the second application seeking the blood sample for further testing. *See Housman*, 986 A.2d at 843.

Therefore, the record supports the trial court's findings, and its rulings were proper. **See Smith**, 164 A.3d at 1257. Accordingly, Appellant's arguments that the trial court erred in denying his motion to suppress merit no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/12/19